RENDERED: SEPTEMBER 26, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0495-OA

IN RE: DWIGHT HOPKINS, LINCOLN CIRCUIT COURT CLERK

## OPINION AND ORDER

This is an original action to determine whether Dwight Hopkins, Lincoln Circuit Court Clerk, should be removed from office or otherwise disciplined pursuant to Section 114(3) of the Kentucky Constitution. Following a careful review of the record, including the evidence presented before the Special Commissioner and the arguments of the parties, we conclude removal is warranted and therefore remove Hopkins as Lincoln Circuit Court Clerk and declare that office vacant.

## FACTUAL AND PROCEDURAL HISTORY

Hopkins was elected Lincoln Circuit Court Clerk on November 8, 2022, to fill the unexpired term of former Circuit Clerk, Teresa Reed. The elected circuit clerk in each Kentucky county is responsible for managing court records, scheduling juries, and receiving court fines and costs for the Court of Justice. In most counties, including Lincoln County, deputy clerks are hired to assist the elected clerk with the performance of these duties.

On March 22, 2023, the Administrative Office of the Courts (AOC) received complaints against Hopkins from seven of the eight employees of the Lincoln Circuit Court Clerk's office alleging acts of unprofessionalism, impropriety, and workplace harassment which created a hostile work

environment.  The complainants included chief deputy clerk and assistant bookkeeper Norma Atwood, deputy clerk Tamara Releford, deputy clerk Lori Henderson, and deputy clerk Robyn Blackburn.[1]

Hopkins was placed on paid administrative leave on May 24, 2023, pending the outcome of an investigation by the AOC.  Following the investigation, the Director of the AOC concluded Hopkins's conduct "constitute[d] discrimination and unlawful workplace harassment, creating a hostile work environment."  A copy of the written findings and conclusions, along with evidence gathered during the investigation, was provided to the Circuit Court Clerk Conduct Commission for further action.  The Commission considered the AOC Director's report and supporting documentation and a written response from Hopkins.  It concluded Hopkins had violated multiple sections of the Circuit Court Clerk Code of Conduct and recommended a public reprimand and other remedial measures.  The Commission referred the allegations against Hopkins to this Court for further proceedings.

Hopkins objected to the imposition of any sanctions and insisted he should be fully and unconditionally reinstated as Lincoln Circuit Court Clerk. He rejected a proposed sanction offered by the Chief Justice, electing instead for a public hearing on the allegations before the full Supreme Court pursuant to Section 114(3) of the Kentucky Constitution.

---

[1] The three other complainants were not relied upon by the Special Advocate in presenting this matter to the Special Commissioner.  Thus, we shall forego any discussion relative to them.

By Order entered on November 3, 2023, this Court instituted removal proceedings against Hopkins. We referred the matter to a Special Commissioner to hold an evidentiary hearing, develop a full factual record, and make findings of fact and recommendations. Upon our invitation and request, the Attorney General served as Special Advocate to represent the interests of the Commonwealth in those proceedings. Pursuant to our order, the Special Advocate had the burden of proving good cause to remove Hopkins from office. *See In re Flynn*, 686 S.W.3d 193, 199-200 (Ky. 2024). The Special Commissioner conducted a two-day evidentiary hearing beginning on February 27, 2024. The Special Advocate and Hopkins each presented witnesses and documentary evidence during the hearing, all of which this Court has reviewed in full, and which is summarized below.

Although the office environment was normal and unremarkable during the first few months following Hopkins's election, the atmosphere changed dramatically on Friday, February 24, 2023, when Hopkins discovered members of his staff were planning a movie outing which would also be attended by his former political opponent, Angie Doolin,[2] among numerous others. Hopkins became upset and contacted Atwood and Releford to express his displeasure at having learned of the movie trip from a source outside the office. In speaking with Atwood, he described Doolin as his "arch enemy" and indicated he was upset because his staff did not consider how the outing would negatively

---

[2] Doolin was appointed as Circuit Clerk upon Reed's retirement and opposed Hopkins in the 2022 special election.

impact him. He said he could not do anything about tenured employees so he did not care about them, but noted Atwood was an at-will employee and that Releford and Smith were still in their probationary period. During an angry phone call later that evening with Releford, Hopkins led her to believe her job was in jeopardy and told her he would "think about this all weekend."[3]

On Monday, February 28, 2023, Hopkins had a closed-door meeting with Atwood where he again expressed his anger about the movie outing, complaining that he believed it was a politically motivated ploy by Doolin, especially since Doolin had stated an intention to run against him in November 2024. Hopkins was angry during the meeting and said he could not get over the movie trip and that he intended to fire Releford and Smith if they attended. He then began making statements which the Special Commissioner described as "derogatory, stereotypical, [and] demeaning toward women" including telling a story about men who visited strip clubs without their wives knowing nor considering their feelings. He compared himself to the unsuspecting wife from the story.[4] He also used foul and obscene language when speaking of Doolin. Hopkins raised his voice to a level that employees outside his office could hear him. The entirety of the conversation centered on Atwood's personal

---

[3] Releford's probation was to end at the close of business on Tuesday, February 28, 2023.

[4] Hopkins failed to understand or appreciate that the analogy would be offensive and, in fact, believed the opposite. In his rebuttal before the Conduct Commission, Hopkins stated "if my staff had no qualms about partying with a known (and possibly) criminal conspirator attempting to overthrow the efficacy of a vital government office, then I really don't think many things make them uncomfortable."

relationship with Doolin. Hopkins believed Doolin was trying to "overthrow" his office.

The following day, Hopkins conducted another closed-door meeting with Atwood. He first apologized for using curse words on the previous day, but the conversation quickly turned to his issues with Doolin. Hopkins again expressed his belief Doolin was trying to "overthrow" or "blow up" his office. At some point, Releford was summoned into the meeting. Hopkins became angry and hostile. He stood up, pointed at Releford, and loudly proclaimed, "What you did really pissed me off." He was referring to the movie outing with Doolin. Releford apologized and began to cry. Hopkins responded that the mere sight of Releford made him sick and proceeded to stick his finger in his mouth and make gagging noises. He repeated the story about the married men going to a strip club and spoke poorly of women in general, stating "men cannot be nice to women when they are their supervisor." Hopkins commented on a photograph of his wife, remarking that she was "smokin' hot" when she was younger, but she now weighed over 300 pounds which he found disgusting and "it really pissed him off." He yelled repeatedly during the meeting and slammed his fists on the desk. Employees outside the office were able to hear the shouting. Atwood and Releford were stressed and anxious because of the meeting.

Later that afternoon, Hopkins called Atwood into his office and threatened to fire Amber Smith because she did not "jive" with him. He described Smith as a "smart aleck" and a "bitch." In a contentious meeting

several days later, Hopkins again told Atwood he was going to fire Smith. He continued by making numerous sexist and derogatory comments about women saying, "women couldn't be trusted," "women cannot tell the truth," "[women] can't help it, it's just the way they are," "men in today's world have a deaf ear and have fallen to believe everything that a woman tells them," "women have to respect men, but men have to respect God," and "women need men and men want women." Hopkins also told inappropriate stories during the meeting. One story centered around a married man attending a party and making out with another woman. The other story involved an Antebellum slave owner who would leave his wife to have sex with one of the slaves. He told Atwood these analogies were meant to illustrate that her friendship with Doolin was creating a bad situation and jeopardizing her job. None of Hopkins's displeasure was related to Atwood's job performance but on her personal life.

On March 17, 2023, Hopkins asked Atwood to come to his office for a meeting. He had cleaned off his desk and lit a candle in what he claimed was an effort to make Atwood comfortable. His actions had the opposite effect. Once again, Hopkins became angry and chastised Atwood for failing to inform him that Doolin had come into "his building." Atwood explained Doolin had come through the front door security and had dropped off a document for a prosecuting attorney. Hopkins threatened to ban Doolin from the clerk's office. He then brought up the movie outing, loudly telling Atwood she was "f***ing crazy to think that Angie Doolin was her friend." He repeated rumors about Doolin which were of a sexual nature and commented negatively about her

appearance.  He reiterated his belief Doolin was trying to "blow up" his office and Atwood was keeping information from him.  Hopkins also talked about Smith, saying she was a "bitch and so was her low-life mother."

Additional meetings between Hopkins and Atwood occurred on an almost daily basis.  The movie outing was raised at nearly every meeting.  Hopkins made numerous inappropriate comments which made Atwood uncomfortable.  He told Atwood she was a "good looking woman for her age" but later called her "cold hearted."  He spoke negatively about his wife's appearance.  The stress and anxiety from the meetings caused Atwood to make changes in her personal life and led her to seek medical help where she learned she was suffering from stress-induced panic attacks and high blood pressure.  She was referred to a specialist to talk about her issues.  Releford also had negative impacts from the stresses of the meetings and office environment.  She began taking medication, got ill at home, and cried extensively, all of which she attributed to the "terrible" office environment and the nervousness it caused.

Other employees heard Hopkins make numerous disrespectful comments about women.  They noted the work environment was not good.  Deputy clerk Lori Henderson described the environment as "hostile" and "toxic" which caused her to become a "nervous wreck" and dread coming to work because she feared becoming the target of Hopkins's anger.  Hopkins once asked her if she knew what "quid pro quo" meant and went on to explain it meant "you scratch my back and I'll scratch yours."  She felt violated and that his actions were "creepy."  Robyn Blackburn indicated the unpredictability of Hopkins's

7

mood was "very stressful" and she could hear his raised voice during many of the meetings with Atwood.

Hopkins admitted to making many of the statements and analogies attributed to him in the complaints. He admitted to raising his voice toward employees on multiple occasions and twice using curse words during meetings with Atwood and Releford. Hopkins conceded to using analogies related to marital infidelity and making comparisons of himself and Atwood to characters in those stories. He admitted telling Releford she made him sick, sticking his finger down his throat, and making gagging noises. Likewise, Hopkins did not deny republishing sexual rumors about Doolin which were baseless. He stated he regretted many of the things he said and that others were offended by them, but contended he acted in good faith.

While acknowledging some of his egregious behavior and actions, Hopkins attempted to downplay their significance and "contextualize" or explain them in a way to shift blame to other parties, even going so far as to hurl ad hominem attacks and accuse others of lying to further a conspiracy he believes was occurring. Hopkins averred he had been the subject of a coordinated "political attack orchestrated by the former circuit clerk, who is his former and possible future electoral opponent . . . ." He contended Doolin was intent on "blowing up" or "overthrowing" his office, and made numerous references to the alleged conspiracy, fraud, machinations, and lies underlying his belief. Nevertheless, he conceded that his actions and words in the

8

workplace failed to show his employees the courtesy and respect they were owed.

On April 24, 2024, the Special Commissioner filed her Findings of Fact, Conclusions of Law, and Recommendations with this Court. Based on the facts found, the Special Commissioner concluded the Special Advocate had established, by clear and convincing evidence, that Hopkins had engaged in unlawful harassment, thereby creating a hostile working environment on the basis of sex, and that his actions had no legitimate work purpose. The Special Commissioner further found Hopkins routinely failed to perform his duties with courtesy and respect toward Atwood and Releford.

Hopkins and the Special Advocate have now filed briefs with this Court. After a careful review of the briefs, the two-day evidentiary hearing conducted by the Special Commissioner, and the record, we conclude Hopkins's removal from the office of the Lincoln Circuit Court Clerk is warranted.

**ANALYSIS**

The authority for removing a circuit court clerk is vested by Section 114(3) of the Kentucky Constitution in this Court, and such removal may be ordered only "upon good cause shown." The Constitution provides no other penalties. We have established that actions for the removal of a circuit clerk shall proceed in this Court as an original action:

> In such proceedings, the Special Advocate bears the burden to show by clear and convincing evidence that good cause exists for removal of the clerk. The circuit court clerk must be afforded an opportunity to rebut such a showing. We review the findings of fact, conclusions of law, and recommendations of a Special

9

Commissioner in a circuit court clerk removal proceeding *de novo*. *In re Flynn*, 686 S.W.3d at 200.

## I. Hopkins Created a Hostile Work Environment

Circuit court clerks are required to conduct themselves in a manner consistent with the high standards of integrity, impartiality, and independence called for by the Code of Conduct and Ethics for the Judicial Branch set forth in Section 2 of the Court of Justice's ("COJ") Administrative Procedures, the Circuit Court Clerk Code of Conduct implemented by Supreme Court Order 2014-12 ("Circuit Court Clerk Code"), and the Workplace Policies contained in Section 3 of the COJ Administrative Procedures ("Workplace Policies"). Circuit court clerks must maintain a "work environment free of unlawful harassment or retaliation based on" several protected classes, including sex, political affiliation, or any other characteristic protected under the law. Workplace Policies § 3.03(1)(a). "Unlawful workplace harassment" is defined as "unwelcome, or unsolicited speech or conduct based upon . . . sex . . . political affiliation, or any other characteristic protected by law that creates a hostile work environment." *Id.* at § 3.03(2)(a). The Workplace Polices also define "hostile work environment" as

> an environment that a reasonable person would consider to be hostile or abusive and the person who is the object of the harassment perceives to be hostile or abusive based on a characteristic protected by law as provided under Section 3.01(1)(a) of these Policies. A hostile work environment is determined by looking at all of the circumstances including, but not limited to: (1) the frequency of the alleged harassing conduct; (2) the severity of the alleged harassing conduct; (3) whether the alleged harassing conduct was physically threatening or humiliating; and (4) whether the alleged harassing conduct has the purpose or effect of

10

unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive environment.

*Id.* at § 3.03(2)(b).

Violation of the Workplace Policies by a circuit court clerk which results in the creation of a hostile work environment "constitutes 'a legal cause which affects the ability and fitness' of the clerk 'to perform the duties of the office.'" *In re Flynn*, 686 S.W.3d at 202 (quoting *Nicholson v. Jud. Ret. & Removal Comm'n*, 562 S.W.2d 306, 308 (Ky. 1978)). Such an action establishes "good cause" for removal. *Id.* In the instant matter, we conclude clear and convincing evidence has been presented that Hopkins created a hostile work environment through verbal workplace harassment.

On multiple occasions, Hopkins made unwanted, derogatory, demeaning and stereotypical statements toward female employees. He used inappropriate analogies when accusing employees of being dishonest. Hopkins yelled and cursed at his deputy clerks during meetings, commented inappropriately regarding Atwood's appearance while negatively commenting about his own wife's weight gain and poor appearance, and angrily and loudly expressed his displeasure with his employees' conduct in their personal lives. Hopkins told Releford she made him physically sick while making an inappropriate gesture and sound.

None of Hopkins's statements or actions were related to job performance, but instead were focused on his deputy clerks having a personal relationship and attending events with his political foe. Hopkins repeated unsubstantiated and inappropriate sexual rumors about Doolin in an effort to distance his

11

employees from her. His actions had no legitimate work purpose and served only to intimidate, humiliate, and demean his employees, and those employees reasonably perceived his actions as being based on sex or political affiliation. Based on our review of the testimony and evidence adduced at the evidentiary hearing, clear and convincing evidence exists to conclude Hopkins created a hostile work environment. His actions interfered with the proper functioning of the workplace which led to physical and psychological impacts to at least two employees. Although his anger and inappropriate behaviors were primarily directed at Atwood and Releford, the negative impact was experienced by his entire staff. Absent his being placed on administrative leave, there is no indication Hopkins would have curtailed his improper conduct nor stopped verbally harassing his employees. As found by the Special Commissioner, such behavior by an elected official towards an employee of the Court of Justice is inappropriate. Hopkins's blatant and repeated violations of the Workplace Policies and Circuit Court Clerk Code are inconsistent with the high standards of integrity, impartiality, and independence required of an elected clerk, and are sufficient to warrant his removal from that office.

## II. Hopkins Failed to Perform His Duties with Courtesy and Respect

The Circuit Court Clerk Code requires clerks to "perform their duties impartially" and "[w]ith courtesy and respect for the public, litigants, lawyers, subordinate employees, and all others with whom the clerk interacts as part of his or her official duties[.]" Circuit Court Clerk Code § 4(2)(a). Disciplinary actions or remedial measures may be imposed for failing to so act. *Id.* at §§

12

8(1), 8(2)(b) and (g).  Hopkins repeatedly, and admittedly, failed to perform his duties as Lincoln Circuit Court Clerk with courtesy and respect toward Atwood and Releford.

By subjecting his employees to a hostile work environment, Hopkins failed to treat them with the courtesy and respect due from a circuit clerk to his subordinate employees.  He admits his actions of yelling, cursing, making demeaning and derogatory comments about women, using inappropriate analogies, and telling Releford he made her sick accompanied by a gagging noise and gesture, constituted a failure to treat Atwood and Releford with the courtesy and respect to which they are entitled.

Further, Hopkins repeatedly and continuously intruded into the personal lives of his employees and attempted to control their activities beyond working hours.  He threatened termination of at-will and probationary employees on several occasions based on those employees' plans to attend the movie outing with Doolin.  The social gathering served as the primary catalyst for his poor behavior which continued and escalated over time.  Hopkins's unsubstantiated belief in a political conspiracy to "overthrow" his office colored his actions toward his employees and his subsequent behaviors fell far below the elevated standards of integrity required of elected officials.

Upon a review of the entirety of the record, we conclude Hopkins's repeated inappropriate statements and actions were "unquestionably a blatant violation of his obligation to perform his duties with courtesy and respect." *In re Flynn,* 686 S.W.3d at 204.  Clear and convincing evidence was provided

13

revealing that Hopkins aberrant actions failed to comport with the ethical requirements of his office. When coupled with his creation of a hostile work environment, the failure to perform his duties with courtesy and respect provides further support for the conclusion that Hopkins should be removed from office. *Id.*

We recognize the significance and severity of the penalty of removing an elected official from his or her office, but nevertheless conclude removal is warranted in this matter. As such, we hereby remove Hopkins from the office of the Lincoln Circuit Court Clerk for the remainder of his present term. The Office of the Lincoln Circuit Court Clerk is declared vacant. Hopkins must pay the costs of these proceedings.

All sitting. All concur.

ENTERED: September 26, 2024

_____
CHIEF JUSTICE


COUNSEL FOR SPECIAL ADVOCATE:

Russell Coleman
Kentucky Attorney General

Aaron J. Silletto
Assistant Attorney General

Zachary Zimmerer
Assistant Attorney General

Victor Bruce Maddox
Office of the Attorney General

COUNSEL FOR RESPONDENT:

Parker M. Wornall
Jason M. Nemes
Dayton N. Blair
Commonwealth Counsel Group PLLC


SPECIAL COMMISSIONER:

Judge Jean Chenault Logue (Ret.)